# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 23-183

**STATE OF LOUISIANA**

**VERSUS**

**ANDREW CHESTLEY MAYO**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 351,109
HONORABLE WILLIAM G. BEARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JONATHAN W. PERRY
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Candyce G. Perret, Jonathan W. Perry, and Wilbur L. Stiles, Judges.

**AFFIRMED.**

**Edward K. Bauman**
**Post Office Box 1641**
**Lake Charles, Louisiana 70602**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Andrew Chestley Mayo**


**J. Phillip Terrell, Jr.**
**District Attorney, Ninth Judicial District**
**Lea R. Hall, Jr.**
**Assistant District Attorney**
**Post Office Box 7358**
**Alexandria, Louisiana  71306**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**PERRY, Judge.**

The issue presented in this criminal appeal, one which involves a drive-by shooting, is whether there was sufficient evidence to support the second degree murder conviction of Andrew Chestley Mayo ("Defendant"). For the reasons set forth below, we affirm Defendant's conviction and sentence.

## PROCEDURAL HISTORY

On January 26, 2021, Defendant was charged alongside Kaitlyn Leeann Carlino ("Ms. Carlino"), Pamela Earlene Smith ("Ms. Smith"), Tyrone Markel Compton ("Mr. Compton"), and Terrence Armstrong ("Mr. Armstrong"), with the first degree murder of Edwin Davidson ("Mr. Davidson"), in violation of La.R.S. 14:30; the attempted first degree murder of Leon Anderson ("Mr. Anderson"), in violation of La.R.S. 14:27 and 14:30; and conspiracy to commit the first degree murder of Mr. Davidson, in violation of La.R.S. 14:26 and 14:30. On May 25, 2021, an "Amended Indictment" was filed, charging the same individuals with the second degree murder of Mr. Davidson, in violation of La.R.S. 14:30.1; attempted second degree murder of Mr. Anderson, in violation of La.R.S. 14:27 and 14:30.1; conspiracy to commit second degree murder, in violation of La.R.S. 14:26 and 14:30.1; conspiracy to commit attempted second degree murder, in violation of La.R.S. 14:26 and 14:30.1; and conspiracy to commit assault by drive-by shooting, in violation of La.R.S. 14:26 and 14:37.1.

On November 17, 2022, Defendant proceeded to trial solely on count one of the indictment: the second degree murder of Mr. Davidson. On November 18, 2022, a unanimous jury found Defendant guilty as charged. On December 8, 2022, Defendant was sentenced to mandatory life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Defendant now appeals his conviction and sentence.

## APPELLANT'S ASSIGNMENT OF ERROR

In his sole assignment of error, Defendant alleges: "The evidence admitted at trial, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) standard, was insufficient to prove beyond a reasonable doubt that Anthony Chestley Mayo committed, or was a principal to, second degree murder."

## APPELLANT'S ARGUMENTS

Defendant argues the State's evidence was insufficient to prove beyond a reasonable doubt he was guilty of the second degree murder of Mr. Davidson. Specifically, Defendant contends the evidence failed to prove he "possessed the requisite intent to be a principal to assault by drive-by shooting, and by application of the felony murder doctrine, second degree murder."

## APPELLEE'S POSITION

The State contends it met its burden of proving Mr. Davidson was killed when Defendant was engaged in the perpetration of an assault by drive-by shooting.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## LAW AND DISCUSSION

Defendant was charged with second degree murder, in violation of La.R.S. 14:30.1:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of … assault by drive-by shooting, …, even though he has no intent to kill or to inflict great bodily harm.

2

The proper standard of appellate review for a sufficiency of the evidence claim is:

> whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As applied in this case, the State must prove Mr. Davidson was killed when the offender was engaged in the perpetration of an assault by drive-by shooting. We find the evidence presented by the State supports the conviction.

The State's first witness, Dr. Yen Van Vo ("Dr. Vo"), an expert in the field of forensic pathology, performed the autopsy on Mr. Davidson. Dr. Vo testified Mr. Davidson died from a gunshot wound to the right side of his forehead, noting she removed the bullet from his brain during the autopsy. Dr. Vo found the manner of death for Mr. Davidson was homicide.

The State then called Shanae Henderson ("Ms. Henderson"), the mother of the victim, Mr. Davidson. She testified that Mr. Davidson was the eldest of her three children, was seventeen at the time he was killed, and had a son born the month after he died. According to Ms. Henderson, she believed Mr. Davidson was at home in bed, asleep, around 11:30 p.m., and she did not know he had left the house until Mr. Davidson's girlfriend texted her saying that he had been shot.

The State's next witness was Sergeant Vince Deville ("Sergeant Deville"), a ten-year veteran of the Pineville Police Department. According to Sergeant Deville, on October 20, 2020, he responded to an initial call of shots fired near Orchard Loop, eventually receiving information that someone may have been shot at 343 Orchard Loop. He testified he and Officer Jared Luney entered the residence and initially spoke with Nolan Purvis ("Purvis") and Barron Ray ("Ray") in the living room, noting they were visibly upset. Sergeant Deville testified they removed both Purvis and Ray from the house, located Mr. Davidson on the ground with a bleeding gunshot wound, and removed two young females from a back bedroom. Sergeant Deville noted what appeared to be several bullet holes in the front of the house. Sergeant Deville noted they held the scene until detectives arrived, which he suggested was no more than twenty minutes.

The State then called Sergeant Jared Bennett ("Sergeant Bennett"), a twelve-year veteran of the Pineville Police Department who was working as a crime scene investigator in October 2020. Sergeant Bennett photographed the crime scene and described numerous photographs, which had already been admitted into evidence through a joint stipulation. Sergeant Bennett noted that spent rounds were recovered that were either .223 or 5.56mm, both common rifle calibers, in addition to 9mm handgun rounds.

The State's next witness was Syria Mahfouz ("Ms. Mahfouz"). She testified that on October 20, 2020, she lived with Ms. Smith and Mr. Compton at a house on Pisciotta Street. According to Ms. Mahfouz, on the day in question she was home with Ms. Smith, Mr. Compton, Defendant, and Defendant's brother, Blaine Milliman ("Mr. Milliman"). Ms. Mahfouz testified they were all trying to obtain Xanax in order to get high; for that reason, she texted Mr. Anderson to purchase some pills from him. According to Ms. Mahfouz, Mr. Anderson was friends with

4

both herself and Defendant. Ms. Mahfouz testified Mr. Anderson indicated he had pills for them to buy. According to Ms. Mahfouz, they were going to buy pills from Mr. Anderson at a store in Wardville. She testified she went to make the purchase with Defendant, Ms. Smith, Mr. Compton, Mr. Milliman, and Ms. Carlino. At the store, Ms. Mahfouz testified, she and Defendant paid Mr. Anderson, who gave them their drugs, then they left. She testified the victim, Mr. Davidson, was in the car with Mr. Anderson. According to Ms. Mahfouz, the drug sale was exclusively between Mr. Anderson and Defendant. She stated the drugs were packaged in a dark cigar pack. Ms. Mahfouz testified they did not look in the pack until they were back in the car, at which time they realized they did not get all the drugs they thought they had purchased. Upon opening the cigar pack, they found only five Xanax and paper that had been wadded up to feel like pills.

According to Ms. Mahfouz, Mr. Anderson and Mr. Davidson had already left the store before the missing drugs were uncovered. While her group drove around looking, they did not see Mr. Anderson or Mr. Davidson and instead returned to the house on Pisciotta Street. Ms. Mahfouz testified that Mr. Compton was angry that his money was wasted and that after they returned to the house on Pisciotta, he talked about shooting up the house on Orchard Loop; although she testified Defendant was in the group that discussed this shooting, she did not recall if Defendant actively participated in the conversation.

Ms. Mahfouz testified that after the discussion, Mr. Compton went and got his friend, Mr. Armstrong, who was armed with his own gun; Mr. Compton armed himself with Defendant's brother's gun; and Defendant was armed with Ms. Smith's gun. Although she described the guns Mr. Compton and Defendant had as being "small guns," she indicated Mr. Armstrong's gun was bigger than a pistol. According to Ms. Mahfouz, she did not want to be involved in any shooting, so she

5

chose to stay home when the rest of the group left a second time. Ms. Mahfouz indicated Mr. Milliman and Ms. Smith's father, Jimmy, also stayed at the apartment on Pisciotta Street.

Ms. Mahfouz testified the group that left Pisciotta Street was Ms. Carlino, Ms. Smith, Mr. Compton, Mr. Armstrong, and Defendant. The next morning Ms. Mahfouz learned that Mr. Davidson had died and asked her uncle to bring her to the police station. She denied that she tried to leave town.

Ms. Mahfouz testified Defendant was primarily at Pisciotta Street to hang out with Mr. Compton and stated she had known Ms. Carlino less than a month when the shooting took place. Ms. Mahfouz testified that, before she could leave with her uncle to go to the police station, law enforcement arrived at Pisciotta Street and detained her, Mr. Compton, and Ms. Smith; she also indicated Mr. Compton and Ms. Smith had come up with a story to tell law enforcement. Ms. Mahfouz acknowledged giving multiple statements to law enforcement and testified that she gave more details in one than in others; however, she maintained that she did not lie to law enforcement.

According to Ms. Mahfouz, she was slightly impaired during her first interview with law enforcement as it was the day after she had taken Xanax and was a "little foggy." She finished her testimony by stating the plan when Defendant and the others left Pisciotta Street the second time "was to go and shoot up the house on Orchard Loop."

The State's next witness was Ms. Smith. Ms. Smith acknowledged that, in exchange for her agreement to testify truthfully, she pled guilty to conspiracy to commit second degree murder and was sentenced to twenty years at hard labor. Ms. Smith testified that in October 2020, she was living on Pisciotta Street with her father, Mr. Compton, her three children, and Ms. Mahfouz. According to Ms. Smith,

6

she owned a Ruger 9mm pistol that she purchased from a gun store in Alexandria. She testified she bought the gun, legally, for protection after being robbed while selling marijuana.

Ms. Smith testified Mr. Anderson knew Ms. Mahfouz, who was always the one who would contact him, and Defendant. According to Ms. Smith, Defendant and Mr. Compton had known each for around a year before she met Defendant and she had met Defendant through Mr. Compton about a year before the shooting.

Ms. Smith stated that on October 20, 2020, Ms. Mahfouz arranged to buy Xanax from Mr. Anderson, Defendant did the transaction, then Mr. Compton realized they had not gotten what they had purchased. Ms. Mahfouz tried to follow Mr. Anderson at Mr. Compton's direction but was unable to find the car, so they returned to Ms. Smith's home.

According to Ms. Smith, the group that made the initial drug purchase was herself, Ms. Carlino who was driving, Ms. Mahfouz, Mr. Milliman, Defendant, and Mr. Compton. She testified Ms. Mahfouz was in the front seat with Ms. Carlino, she was in the back with Mr. Compton and Defendant, and Mr. Milliman was sitting in the hatchback area behind the back seat. Although she could not remember the name of the store, Ms. Smith testified the drug deal took place at a convenience store on the corner of Highway 107 and Bragg Street. Ms. Mahfouz and Defendant approached the car and bought the drugs; while she knew they were supposed to be getting drugs from Mr. Anderson, there were two people in the car, and she could not see who they were. Ms. Smith did not know the details of the purchase but recalled Mr. Compton and someone else put up the money and all they got was five Xanax and a bunch of paper.

Ms. Smith testified that while the others were upset because they did not get as many drugs as they wanted, Defendant and Mr. Compton were angry that they

were ripped off by Mr. Anderson. Once they got back to Pisciotta, Ms. Smith testified, Mr. Compton called Mr. Armstrong, who showed up quickly, and Mr. Armstrong, Mr. Compton, Defendant, and Mr. Milliman were all talking together outside the car. Although not very knowledgeable about "big guns," Ms. Smith testified that Mr. Armstrong had his gun, which was a rifle, when he came over because "[h]e always had his gun."

Aside from Mr. Armstrong who had his own rifle, Ms. Smith testified that Defendant had her gun although she did not give it to him, and Mr. Compton had another gun although she was not sure where it came from. She testified that Ms. Mahfouz had realized she was blocked from contacting Mr. Anderson and the guys were trying to decide how to confront him about the previous purchase.

Ms. Smith stated the men came back with a plan to confront the people who sold them the drugs; however, she claimed no one mentioned shooting. She, Ms. Carlino, Mr. Compton, Mr. Armstrong, and Defendant then went back outside to enact the plan. She testified she was driving, Ms. Carlino was in the passenger seat, and the three men got into the back seat, although Defendant got into the hatchback area later. According to Ms. Smith, she was driving because Ms. Carlino was too intoxicated.

Ms. Smith testified they went to someone's house but that she has a memory gap and does not remember to whom the house belonged. Defendant got into the hatchback area of the car and then they drove to Orchard Loop. Defendant and Mr. Compton directed Ms. Smith to the house on Orchard Loop. She did not initially realize they were headed to the house where they bought drugs on October 16, 2020.

According to Ms. Smith, they told her to make the loop by the house and she thought they were looking for who they planned to confront; however, that was when the shooting started. She testified she saw Mr. Armstrong shooting his rifle out of

the back driver's side window and while she believed there was more than one gun being fired, she did not see Mr. Compton or Defendant shooting. At that point, Ms. Smith left and drove straight back to her home.

Ms. Smith testified they cleaned shell casings out of the car when they got back to her home. Although she remembered most of the casings being longer ones that came from Mr. Armstrong's rifle, she did recall there being a few shorter casings in the car. According to Ms. Smith, Mr. Armstrong seemed happy about the shooting; meanwhile, she and Mr. Compton argued, and Mr. Compton tried to convince her he did not realize there was going to be a shooting. She testified that once they were back at Pisciotta, they did not think anyone had been hurt because there was no one outside when the shooting started. Ms. Smith said they filled Mr. Milliman and Ms. Mahfouz in on what happened then spent the night doing drugs and drinking to relieve stress.

At some point later in the night, Ms. Smith testified she, Mr. Compton, and Ms. Mahfouz stayed at Pisciotta while Mr. Milliman, Ms. Carlino, and Defendant all left. According to Ms. Smith, they did not learn someone had died until Ms. Mahfouz saw it on social media the next day; Mr. Compton "was trying to convince his self [sic] that it was a different situation, that it just seemed like a coincidence." Ms. Smith testified that before law enforcement contacted any of them, everybody had agreed to say they bought drugs and were home before midnight. She confirmed everyone had agreed to the story except Mr. Milliman; she was unsure if anyone had contacted him.

Ms. Smith testified that on October 22, 2020, law enforcement showed up looking for Ms. Mahfouz before detaining Ms. Mahfouz, Ms. Smith, and Mr. Compton and bringing them to the police station in separate vehicles. She saw Ms. Carlino and Defendant arrive at the police station later in the day. Ms. Smith testified

9

she stuck to the plan of claiming they bought drugs then went home during her first interview before breaking down in her second interview later the same day. According to Ms. Smith, her second statement revolved heavily around Mr. Armstrong because she was afraid of him, and she did not believe he had been detained yet.

On cross-examination, Ms. Smith clarified she bought her gun because she was selling large quantities of marijuana and had been robbed at gunpoint. She confirmed that, on October 20, 2020, they were riding in Ms. Carlino's car; however, Ms. Smith drove during the shooting because she felt she was in better shape than Ms. Carlino despite them both being intoxicated. Ms. Smith stated again that she remembered making a stop before going to Orchard Loop, but she had no recollection of where or why they stopped.

Ms. Smith testified that she did not see Mr. Compton take her gun but that she did not know where it had been for two weeks prior to the shooting. She also stated she could not confirm how many guns were in the car during the shooting. She also stated that she and Ms. Carlino were basically in shock when they returned to Pisciotta and immediately sought out Ms. Mahfouz when they got out of the car. Despite repeatedly stating that she had been grateful no one was outside, Ms. Smith testified she would not be surprised to learn someone had been outside.

Ms. Smith testified that she knew law enforcement had not arrested Mr. Armstrong because she had to show them a picture of him on social media at the police station so they could identify him. Although Ms. Smith contended that she did not know how many guns were used during the shooting, she acknowledged knowing Mr. Armstrong, Mr. Compton, and Defendant had guns before the incident and that she had no reason to believe any of them had gotten rid of their gun prior to the shooting.

10

The State's next witness was Detective Miranda Collura ("Detective Collura"), a sergeant with the Pineville Police Department. According to Detective Collura, she was a crime scene detective when the shooting happened and subsequently took over evidence duties. She testified Detective Bennett had called her to the scene of the shooting the morning after to help him process it. Detective Collura testified she took samples from every location Detective Bennett suspected contained blood, noting all of the blood was inside the home and belonged to Mr. Davidson. She testified that she also obtained and executed a search warrant on Ms. Carlino's car; although she did not remove anything from the vehicle, she was responsible for photographing it. She also authenticated surveillance video obtained from the convenience store where the drug purchase took place.[1] According to Detective Collura, the video showed Defendant and Ms. Mahfouz approaching a small, grey SUV in the parking lot before returning to Ms. Carlino's vehicle.

The State's next witness was Ms. Carlino. According to Ms. Carlino, she was seventeen when the shooting in question happened. Ms. Carlino testified that she believed they were supposed to be buying fifteen Xanax pills from Mr. Anderson and instead received five Xanax and ten pieces of paper wadded up in the shape of pills. She testified that at the time of the drug purchase, she, along with Defendant, Mr. Compton, Ms. Smith, Ms. Mahfouz, and Mr. Milliman were present. Although Ms. Carlino was in the passenger seat during the drug deal, they were all in her car. Ms. Carlino testified the purchase was ninety dollars in exchange for fifteen Xanax, noting she had provided forty dollars and Mr. Compton provided the other fifty. According to Ms. Carlino, Defendant got back in the car with the supposed drugs and the white SUV the sellers were in honked the horn and "skirted off."

---

[1] We note this video was never offered into evidence or published to the jury. Although it is not in evidence, Detective Collura was allowed to describe what happened in the video.

Ms. Carlino testified they initially tried to follow the SUV; however, the vehicle was already gone so they returned to Ms. Smith's home. Ms. Carlino did not recall the conversation outside, instead testifying everyone got out of the car and went into Ms. Smith's residence. She acknowledged there was some conversation in the parking lot but stated she was so intoxicated she could not remember. Ms. Carlino testified that everyone seemed okay while they were doing drugs; she noted Mr. Armstrong showed up around an hour later. She testified "all the guys were outside," while she, Ms. Smith, and Ms. Mahfouz were inside watching television, so she was not a part of the conversation happening in the parking lot.

Ms. Carlino testified that later she was told Ms. Mahfouz had arranged for them to either get their money back or to get the Xanax they had paid for; it was not until they got in the car that she noticed Mr. Armstrong had a gun. She noted it was a longer gun, although she stated it did not look like a shotgun. She testified both Defendant and Mr. Compton were armed with pistols. According to Ms. Mahfouz, she believed Mr. Milliman gave his gun to his brother, Defendant, although she then testified that she knew for a fact Defendant had Ms. Smith's pistol and Mr. Compton had Mr. Milliman's pistol.

According to Ms. Carlino, she believed the guns were for protection due to the prior incident of being shot at while dealing with Mr. Anderson. She testified she heard the men talking about maybe beating up Mr. Anderson but claimed she thought that was the worst thing that might happen. According to Ms. Carlino, her connection to the people in this case was entirely through Defendant.

Ms. Carlino testified that when they went to Orchard Loop, Ms. Smith was driving with Mr. Compton behind her, Ms. Carlino was in the passenger seat with Mr. Armstrong behind her, and Defendant was in the hatchback portion of the car. She testified they initially stopped on another street, and she thought the guys were

going to go speak with Mr. Anderson; instead, Mr. Compton told Ms. Smith to drive around and upon approaching Mr. Anderson's home, they slowed down, and the guys started shooting. Ms. Carlino testified "[i]t sounded like they all emptied their clips, honestly." She stated all three men were shooting while Ms. Smith drove.

Ms. Carlino did not know if the guys hit anything or anyone, stating she looked and saw Defendant and Mr. Compton shooting then turned back around and looked at her phone. According to Ms. Carlino, Mr. Armstrong was the last one shooting but she saw Mr. Compton and Defendant shooting out of the windows of the car. She testified that Defendant stated they would "handle this in the streets" immediately after the shooting, then they all returned to Ms. Smith's residence. Ms. Carlino testified she recalled Mr. Compton high-fiving Defendant when they got out of the car at Ms. Smith's residence.

Ms. Carlino did not recall any effort being made to clean her car, although she acknowledged finding a shell casing the next day when she turned on her windshield wipers. She testified law enforcement got in touch with her father the day after the shooting and that she turned herself, and her car, in to law enforcement.

On cross-examination, Ms. Carlino testified that during the October 16, 2020 event and the shooting on October 20, 2020, she let Ms. Smith drive because she did not know the area and did not function as well while on Xanax. She noted that there were parts of the week she could not remember, even the day after the shooting, due to her Xanax usage. Ms. Carlino clarified that on the night of the shooting, she saw Defendant firing his gun out of the rear driver's side window. She stated he was leaning over the back seat and shooting out of the window while Mr. Compton was pressed against the driver's seat and firing out of the same window.

According to Ms. Carlino, when she, Defendant, and Mr. Milliman left Ms. Smith's residence, Mr. Milliman's gun was in its case on the floor of her car. She

13

testified the gun was brought into the house when they got back to Defendant's sister's house. Contrary to Ms. Smith's assertion that they stopped before getting to the house at Orchard Loop, Ms. Carlino testified that no one ever got out of the vehicle from the time they left Ms. Smith's residence until they returned. While Ms. Carlino acknowledged having trouble remembering everything that happened when she was taking Xanax, she testified she was completely confident about what she told the jury because "the things I do remember is very well."

The State's next witness was Mr. Anderson. According to Mr. Anderson, he was not involved in a drug transaction on October 20, 2020, he simply handed someone a cigar pack as part of the transaction. Mr. Anderson continued to maintain that he was not selling drugs but that he was with the victim, Mr. Davidson, who handed him drugs to pass to Defendant and Ms. Mahfouz in exchange for money, which Mr. Anderson claimed he gave to the victim.

Later that night, Mr. Anderson claimed he dropped Mr. Davidson off at the home of another friend, Barron "B-Ray" Ray, returned his mother's car, and was walking back to B-Ray's house where they and another friend, Nolan "Rambo" Purvis, were all "going to get ready to go to school in the morning." According to Mr. Anderson, he lived a street over from B-Ray's home and was walking back from dropping off his mom's car at his house. Mr. Anderson testified that as he was approaching B-Ray's home, he saw a car stop in the street and start shooting at the house; once the shooting was finished, he approached the house to see if everyone was okay. Mr. Anderson then clarified the car did not stop but simply came to a slow roll as the shooting began. Mr. Anderson estimated over thirty shots were fired. Although he did not know whose car it was, he recognized that it was the same car from the drug deal earlier in the day. Mr. Anderson testified he could not see who was in the car during the shooting.

Mr. Anderson testified that when B-Ray finally let him into the house after the shooting, he saw Mr. Davidson on the ground, dead. He testified that B-Ray was on the telephone with the ambulance while Rambo was trying to give Mr. Davidson CPR and Mr. Anderson was just standing there with B-Ray's two young sisters; he believed everyone was in shock. Mr. Anderson stated that he did not see the victim moving or talking when he arrived. Mr. Anderson testified that he did not know Ms. Smith, Mr. Armstrong, or Mr. Compton, although he was aware Mr. Davidson had previously had issues with Mr. Compton. According to Mr. Anderson, law enforcement took him to the police station in a separate car from Messrs. Ray and Purvis.

Mr. Anderson admitted to changing his story during his interview with law enforcement, noting he initially told them he never entered the house because he "was just shocked and everything, but I had to go back and tell the truth about everything because at the same time that's my friend."

The State's next witness was Detective Katie McBride ("Detective McBride"), a seven-year veteran of the Pineville Police Department. Detective McBride testified that during her initial canvas of the area with Sergeant Deville they located two types of shell casings, 9mm and .223 rounds. Detective McBride also testified there were holes throughout the home where bullets went through the walls from the outside. According to Detective McBride, both Ray and Purvis were too distraught to really speak with her at the time; however, they directed her to speak with Mr. Armstrong.

After speaking with the three men at the police station, Detective McBride testified they began looking for Defendant. Additionally, Detective McBride testified that surveillance cameras in the neighborhood led her to focus on trying to find a blue, four-door Toyota Matrix. This information led to Detective McBride

identifying Ms. Mahfouz and subsequently learning the location of Ms. Smith's residence. She testified to encountering Ms. Smith, Mr. Compton, and Ms. Mahfouz at the 4109 Pisciotta residence. According to Detective McBride, it was Ms. Mahfouz who led law enforcement to Ms. Carlino.

Detective McBride testified law enforcement learned Ms. Carlino's address from her employer, discovered a blue, four-door Toyota Matrix at the residence, and contacted the owner, Ms. Carlino's father, who took her to the police station. Through interviews with Ms. Smith, Mr. Compton, Mr. Milliman, Defendant, Ms. Mahfouz, and Ms. Carlino, law enforcement began investigating a drug deal that occurred at the Tobacco Stop on the corner of Bragg Street and Melrose. Detectives obtained security footage from the store showing Defendant and Ms. Mahfouz exit Ms. Carlino's car, approach a silver car briefly, then return to Ms. Carlino's car. Detective McBride noted the video was saved to a thumb drive and was subsequently lost. According to Detective McBride, Mr. Milliman's firearm was brought to the police station by Mr. Milliman and his mother.

Detective McBride testified that after identifying Mr. Armstrong as an involved party, an arrest warrant was obtained by law enforcement, but they were unable to find Mr. Armstrong until he turned himself in to the Rapides Parish Detention Center about a week later. Despite testimony that Ms. Smith's firearm ended up back at her residence, law enforcement was unable to locate the weapon. Detective McBride testified she believed they seized $153 from Mr. Anderson although she was unsure if they seized any drugs from him.

According to Detective McBride, when most of the people involved were brought to the police station the day after the shooting, they were all separated into different rooms. Detective McBride testified that it was impossible to identify anyone in the video of the drive-by shooting; however, she asserted she was able to

identify Defendant and Ms. Mahfouz in the lost video from the Tobacco Stop convenience store. She affirmed the shell casings from the crime scene were all either .223 or 9mm rounds.

The State then called Mr. Milliman. Mr. Milliman testified that on October 20, 2020, he went with Ms. Carlino, Defendant, Mr. Compton, and Ms. Mahfouz to buy drugs at a store. Mr. Milliman testified that he believed the drug deal was to purchase eighteen or nineteen Xanax, but they only got five pills. According to Mr. Milliman, everyone inside the car was angry when they realized what happened, and they circled the block trying to find the dealers before returning to Ms. Smith's residence. Mr. Milliman testified that after they returned to Ms. Smith's residence, there was a conversation outside, the contents of which he did not remember, then he went inside the residence where he remained until after the shooting.

Mr. Milliman testified that Mr. Compton had his gun, Defendant had a gun that he got from Mr. Compton, and Mr. Armstrong had his own gun. Although he could not remember the words of the conversations that occurred, Mr. Milliman testified that everyone was angry. Mr. Milliman testified the others were planning to go over and scare the people they bought drugs from, and he wanted nothing to do with it, so he did not go. Mr. Milliman confirmed that Ms. Mahfouz stayed with him when the rest of the group left.

According to Mr. Milliman, when the others returned, they were talking about shooting up a house. Afterwards, Defendant, Ms. Carlino, and Mr. Milliman left, and Ms. Carlino brought the brothers back to their sister's house. Mr. Milliman acknowledged that he had turned his gun into law enforcement and stated he gave it to Mr. Compton the night of the shooting because Mr. Compton told him he wanted to shoot it, although he did not specify what he was going to shoot at. He confirmed that Mr. Armstrong had his own gun, a rifle, with him the night of the shooting. Mr.

Milliman testified Mr. Compton returned Mr. Milliman's gun when they returned to Ms. Smith's residence.

The State's final witness was Mike Stelly ("Mr. Stelly") of the North Louisiana Crime Lab. According to Mr. Stelly, he has been at the crime lab for over twenty-nine years and his primary duties are firearms identification and fingerprint identification. Mr. Stelly was accepted by the court as an expert in the field of firearms identification. Mr. Stelly walked through the process of determining whether there was a rifle and two 9mm pistols involved in this case. Ultimately, he determined the bullet recovered from Mr. Davidson's body was fired by a 9mm pistol but not by the pistol recovered from Mr. Milliman. Additionally, Mr. Stelly testified there may have been a fourth weapon as well. The State then rested its case and the defense opted not to call any witnesses.

While Defendant contends the evidence at trial primarily consisted of "the suspect testimony of several young co-defendants under the influence of alcohol and narcotics" and was insufficient to find Defendant "to be a principal to assault by drive-by shooting," we find the evidence at trial was sufficient to prove Defendant was an active participant in the drive-by shooting and furthermore fired the bullet, which killed Mr. Davidson. Testimony from Ms. Smith, Ms. Carlino, Ms. Mahfouz, and Mr. Milliman placed Defendant in the vehicle at the time of the drive-by shooting; Ms. Smith testified Defendant was armed with her 9mm pistol while Mr. Compton had Mr. Milliman's 9mm pistol and Mr. Milliman confirmed he had given his gun to Mr. Compton that night. Ms. Carlino specifically testified that she saw Defendant firing his weapon from the vehicle. Furthermore, the testimony of Mr. Stelly, accepted as an expert in firearms identification, established that Mr. Milliman's pistol was not the weapon which fired the shot that killed Mr. Davidson. Given that multiple witnesses testified Mr. Compton had Mr. Milliman's pistol and

Mr. Armstrong was firing his own rifle, the Defendant is left as the only individual in the car who could have fired the shot that killed Mr. Davidson.

Viewing the evidence in the light most favorable to the prosecution, we find the State sufficiently proved that Defendant actively participated in an assault by drive-by shooting during which he fired a 9mm round which struck Mr. Davidson in the head, resulting in his death. While Defendant attacks the testimony of the various witnesses because of their age and intoxication at the time of the drive-by shooting, this court has long held that determinations of witness credibility are within the purview of the jury.

> The determination of credibility is a function of the trier of fact. When there is conflicting testimony as to factual matters, the determination of credibility of witnesses is within the sound discretion of the trier of fact and such determination is entitled to great weight on appeal. *State v. Robertson,* 421 So.2d 843 (La.1982); *State v. Barrett,* 544 So.2d 654 (La.App.3d Cir.), *writ denied*, 551 So.2d 1336 (La.1989). The trier of fact may accept or reject, in whole or in part, the testimony of any witness. *State v. Butters,* 527 So.2d 1023 (La.App. 1st Cir.1988), citing *State v. Richardson,* 459 So.2d 31 (La.App. 1st Cir.1984).

*State v. Jeansonne*, 580 So.2d 1010, 1014 (La.App. 3 Cir.), *writ denied*, 584 So.2d 1170 (La.1991).

The jury was aware that most of the witnesses in this case were intoxicated and/or under the influence of drugs on the night of the shooting. Despite this fact, no evidence was introduced to show the witnesses were lying or mistaken when they testified that Defendant was in the car during the drive-by shooting which resulted in Mr. Davidson's death, that he was shooting out of the car, or that he was armed with a 9mm pistol, which was not recovered. Accordingly, we find no merit to Defendant's assignment of error.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**